**Pages 1 - 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

UNITED STATES OF AMERICA, )
Plaintiff, )
VS. ) **NO. CR 22-00426 JSC**
DAVID WAYNE DePAPE, )
Defendant. )

San Francisco, California
Friday, May 17, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
ISMAIL J. RAMSEY
UNITED STATES ATTORNEY
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
**BY: LAURA E. VARTAIN**
**HELEN L. GILBERT**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
JODI H. LINKER
FEDERAL PUBLIC DEFENDER
450 Golden Gate Avenue
Room 19-6884, Box 36106
**BY: ANGELA H. CHUANG**
**ASSISTANT FEDERAL PUBLIC DEFENDER**
**JODI H. LINKER, FEDERAL PUBLIC DEFENDER**

Also Present: **Aaron Tam, U.S. Probation**
**Christine Pelosi**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**Friday - May 17, 2024** **10:05 a.m.**

**P R O C E E D I N G S**

---o0o---

(Defendant present, in custody.)

**THE CLERK:** Calling Criminal Action CR 22-0426, U.S.A. vs. David Wayne DePape.

**MS. VARTAIN:** Good morning, Your Honor. Laura Vartain and Helen Gilbert for the United States.

**THE COURT:** Good morning.

**MS. CHUANG:** Good morning, Your Honor. Angela Chuang and Jodi Linker on behalf of Mr. DePape, who is present and in custody.

**THE COURT:** Good morning.

Good morning, Mr. DePape.

**THE DEFENDANT:** Good morning.

**PROBATION OFFICER TAM:** Good morning. Aaron Tam with the Probation Office.

**THE COURT:** Good morning.

So, Mr. DePape, on November 16th, 2023, you were convicted of one count of attempted kidnapping of then Speaker of the House Nancy Pelosi and a second count of assault on Speaker Pelosi's spouse.

Now is the time set for sentencing. I reviewed the Presentence Report, the sentencing memorandum from the Government, along with a victim impact statement from

Speaker Pelosi's chief of staff, and I also understand we have two victim impact statements to be read by the Pelosis' daughter.

**MS. VARTAIN:** Correct.

**THE COURT:** And I reviewed, Mr. DePape, your sentencing memorandum, along with two expert reports in their entirety, and letters submitted from family members and friends of yours as well. And, of course, I sat through the trial.

So I think the way we'll proceed this morning is we'll go through the Presentence Report, determine if there are any objections to the findings of fact. Then we'll go and I'll do the guideline range. And then we'll hear from the victim, the victim impact statements. Then I'll hear from the Government and then from the defense. All right?

Okay. First, with respect to the Presentence Report, I understand there are no objections with respect to the findings of fact. Is that correct, Ms. Chuang?

**MS. CHUANG:** That's correct. Our objections that are outstanding are to offense level calculations.

**THE COURT:** Right. And the Government has no objections?

**MS. VARTAIN:** Correct, Your Honor.

**THE COURT:** So I'll accept the Presentence Report with respect to its findings of fact.

So my responsibility today is to determine an appropriate

sentence; that is, one that is no greater than necessary to achieve the purposes of sentencing that have been set forth by Congress in 18 U.S.C. Section 3553(a).

The first step in doing so is to determine the appropriate guideline range from the Sentencing Guideline, which is just one factor among many. So let me give you what my tentative view is, and if anyone wants to be heard, they can.

My tentative view is that I believe that Probation's calculation is correct; that with respect to Count One, the attempted kidnapping of Speaker Pelosi, the total offense level is 40, and with respect to Count Two, the assault on the immediate family member of a government official, the total offense level is 36.

Under the guidelines, we take the highest of the two when there are multiple counts of convictions, which is 40, and we add 2, which would lead to a guideline range of 42 -- a total offense level of 42 and a guideline range of 360 months to life. The statutory maximum on Count Two, though, is 30 years and on Count One is 20 years.

With respect to the objections -- and in reaching this calculation, I have obviously overruled the Government's contention that the terrorism enhancement under Sentencing Guideline 3A1.4(a) should apply. I think that argument is foreclosed by binding Ninth Circuit precedent, including *United States vs. Ehmer*, E-h-m-e-r, from last year, because

neither offense of conviction is an enumerated crime of terrorism.

And then with respect to whether an upward departure is warranted, I don't believe the Government has met its burden of identifying the particular specific government conduct that Mr. DePape was retaliating against or intending to affect. So I don't believe the upward departure. I'll also note the guideline range includes whatever the upward departure range would involve anyway.

And then with respect to the defense objections, I overrule Objections Number 2 and 3 as they merely disagree with the jury's findings based on the trial evidence.

With respect to the contention that a two-level reduction for acceptance of responsibility is warranted, it is true that in rare circumstances, such a reduction may be warranted even though a defendant has put the Government to its burden of proof of trial. That is when a defendant admits factual guilt and has a legal argument with respect to the conviction.

The one case you cited in which you say says that, with respect to intent, you can contest intent and still be eligible, *United States vs. McKittrick*, was a case involving the killing of a wolf in which there was no factual dispute as to intent. In fact, everyone, including the Government, conceded he had no intent. And there was a legal argument as to what was the intent required by the statute.

Here, Mr. DePape made a factual, and continues in those Objections 2 and 3 to make a factual objection or defense; that is, as a matter of fact, he did not have the intent, he did not take his actions on account of a government official's position or conduct. So it's a factual challenge, not a legal challenge and, therefore, I believe, not eligible.

So that's how I came to agree with Probation's calculation. And if anyone wishes to be heard, I will hear them.

**MS. VARTAIN:** Would you like to hear the argument now as it concerns any of the objections?

**THE COURT:** With respect to the guideline, yes. I mean, your objections are, obviously, preserved for the record.

**MS. VARTAIN:** Thank you, Your Honor.

I think -- I think the Government will preserve its objection on the terrorism enhancement and argue how that applies to sentencing later, but understands the Court's ruling.

**THE COURT:** Okay.

**MS. CHUANG:** Same here, Your Honor. We have nothing further as to the objections.

**THE COURT:** Okay. All right. Thank you. And, again, the objections are preserved for the record.

So that means the first factor and only one factor, not given any more weight than any other factor, is the guideline

range, then, of 360 months to life.

So now we will hear from, I believe, Christine Pelosi.

Good morning.

**MS. CHRISTINE PELOSI:** Good morning, Your Honor.

(As read):

"Dear Judge Corley, ever since the defendant violently broke into my home and woke me up yelling 'Where's Nancy?' at 2:00 a.m. on October 28th, 2022, my life has been irrevocably changed.

"Awakened by a large violent man holding a hammer and zip ties, I tried to calm him and save my own life. I tried escaping from my bedroom to the elevator to call the police but he crowded into the elevator with me and prevented my escape or rescue. The defendant knew I was alone and could have left once he learned that my wife Nancy Pelosi, then Speaker of the House of Representatives, was in Washington, D.C. for work, but he kept me hostage in my own home saying he would wait for her. I managed to make my way into my bathroom to call the police, and he could have left, but he continued to stay. He threatened me, saying he would tie me up and wait for my wife. He repeatedly said that he could 'take me out.' I finally convinced the defendant to go downstairs; and just when the police arrived and I

thought I would be free, he did not run away out the back patio door that he'd broken into, or even run past the police officers who stood at the door without their guns or tasers in hand. Instead, as he later testified, the defendant made me 'take the punishment' with a vicious assault. After the defendant struck me in the head with blows from his hammer, I fell unconscious.

"When I awoke in a pool of my own blood, I had severe head, arm, and hand injuries. The paramedics who cut off my clothes and put tourniquets on my head and arms kept me awake and helped save my life. But even after emergency trauma surgery and six days at San Francisco General Hospital, my injuries were severe and persistent.

"My head injuries continue to affect my life. My hair grew back, but I have bumps on my head from the hammer blows and a metal plate from skull surgery. The dizziness has not gone away. In late November of 2023 -- 13 months after the assault -- I felt vertigo and fell twice at home, leading to extensive medical evaluations including MRIs and nerve block injections in my neck. Treatments continued into February 2024. I walk slowly and have difficulty with my balance. Nearly every day I get

headaches that become migraines unless quickly addressed. I need to sleep during the day and cannot tolerate bright lights or loud noise for extended periods of time.

"The defendant severely damaged the nerves in my left hand. My forehand was 'de-gloved' exposing raw nerves and blood vessels. Surgeries and treatments mostly healed the skin, but underneath I still feel pinched nerves in my left hand. This makes basic tasks like using buttons, cutlery, and simple tools more difficult.

"My right arm had several stitches for 8 weeks.

"For months, sleeping alone in my home was very difficult because I kept remembering the defendant breaking into my house.

"To this day, I keep away from media and video of the attack for my own peace of mind. My family and friends were traumatized by the attack, and many political spouses with whom I have grown close during my wife's service in Congress have been both sympathetic to me and scared for their own safety. To protect my healing, I do not address the assault with my wife or anyone else. Nor do I discuss the trauma experienced by my wife, who remains under 24-hour security even though she is no longer serving

as Speaker of the House.

"It has taken many months to reclaim my home and well-being. Even so, we do not answer our landline phone or our front door due to ongoing threats. We cannot fully remove the stain on the floor in the front entryway where I bled. As recently as this week, we have had to improve safety measures at our home due to ongoing threats.

"I ask that you consider the premeditated kidnapping of my wife, the vicious attack and assault on my life, and the ongoing physical and mental injuries caused by the defendant and sentence him to the fullest extent the law provides.

"Thank you for your consideration.

"Sincerely, Paul Pelosi."

**THE COURT:** Thank you.

**MS. CHRISTINE PELOSI:** (As read):

"Dear Judge Corley: The violent assault on my husband Paul in the privacy of our home has had a devastating effect on three generations of our family.

"Reports of the home invasion with shouts of 'Where's Nancy?' -- echoing the January 6th threats -- filled me with great fear and deep pain. A violent man broke into our home, threatened to

kidnap me, and -- in his own words -- made my husband Paul 'take the punishment' in my absence with a near-fatal attack with a hammer.

"My husband Paul is a kind gentleman and husband, a revered father and grandfather, and a respected friend to many. Our home has always been a sanctuary for our family. Therefore, the break-in and violation of our domestic tranquility is having a long-lasting impact.

"Despite my husband's courageous efforts to save his own life -- by trying to escape to the elevator, by calling 9-1-1, and by calmly convincing the attacker to go downstairs to the front door -- Paul was nearly killed in the front entrance to our home. Even now, eighteen months after the home invasion and assault, the signs of blood and break-in are impossible to avoid. Our home remains a heartbreaking crime scene.

"Personally, the physical attack on Pop (his family name) continues to take its toll on his well-being. Being violently struck in the head multiple times with a hammer has ongoing consequences. Instances of dizziness and fainting persist, and falling down as a result of fainting has caused him further pain, bruising, and nerve damage.

"When I first learned about the attack, I flew home to San Francisco from Washington, D.C., and spent six days with Paul in the hospital. When Paul came home, I spent many days with him as he convalesced. In the year and a half since his hospitalization, Paul has continued to struggle with injuries, and those struggles have become part of our domestic routine. Eighteen months after the assault, the repercussions of the attack on Paul affect his health and limit his social and public engagements. While Pop has been able to participate in some events, they are limited, and Paul has to prepare carefully for them. At all events, he paces himself, avoids extended exposure to bright lights and loud noises, and mostly remains seated.

"This, in turn, affects my official schedule. For example, I was preparing to leave San Francisco in November 2023 on a red-eye flight to Atlanta to attend the funeral of former First Lady Rosalynn Carter, whom I was proud to know. However, that afternoon, I saw Paul faint and fall in the kitchen. Later, Paul fainted and fell on our bedroom floor. I canceled my trip and accompanied him to medical appointments. While we would usually not speak publicly about his injuries, it was clear that my

plans to attend the Carter funeral changed for personal health reasons, and everyone was sympathetic.

"Paul and I have not discussed the events of that horrible night of October 28th, 2022. Paul doesn't want to undergo revisiting it, and the doctors' advice is that discussing the vicious assault would only renew his trauma.

"Once you are attacked in such a public and political manner with such threatening language, you always have to fear a copycat. Adding to the pain and uncertainty of recovery is the terrible example set for other families in public service. When I encourage people -- especially women -- to consider running for office, physical threats to the family should not even be a factor, but they are. In addition, when the attack is a source of sick humor -- especially to people in high places -- it adds to the pain, the fear, and the threat to those who might consider public office.

"It is therefore necessary that the guilty party's sentence be very long as a punishment for the attack and the injuries Paul continues to suffer, and as a deterrent to others considering violence against public officials.

"Sincerely, Nancy Pelosi, Speaker Emerita."

**THE COURT:** Thank you, Ms. Pelosi.

**MS. CHRISTINE PELOSI:** Thank you, Your Honor.

**THE COURT:** Okay. I'll now hear from the Government.

**MS. VARTAIN:** Thank you, Your Honor.

I think that the letters that Christine Pelosi just read on behalf of her parents, together with the letter from the Chief of Staff, really highlight that there are two aspects, two lenses by which we can view this crime.

The first is really just raw violence. This is raw violence on the part of the defendant when he swung the hammer. But it goes back before then because he intended to inflict violence when he entered the Pelosis' home. We know that, of course, from the trial evidence and the words you heard from the defendant that he expected that the Speaker would lie and that he would break her kneecaps.

The Government doesn't have anything to add to the letters as it concerns the trauma on Mr. Pelosi or the family, and so I'll leave the raw violence at that.

The second piece is the defense motivation. And the defense motivation, whether or not the Court applies the terrorism enhancement or not, was clearly intended to affect Government conduct and, specifically, the Speaker's conduct. It was intended to retaliate against her and to punish her. But it went beyond that because he also wanted to punish those

in Congress, to show them, through her -- through the Speaker's broken kneecaps, that they were corrupt themselves. And so this truly is an act of domestic terrorism.

The defendant, in his statement to KTVU, claimed in a sense to be a patriot. He said that this is the time for patriotism and that he wished he'd gotten more of them. But this is no patriot. This is a domestic terrorist and it is a lone-wolf domestic terrorist.

I would pause for a moment on the defense's contention that the January 6th cases are directly applicable. They are not. They certainly have similarities, some significant similarities in terms of the impact, the disruption, and really striking at the heart of our democracy. But those cases are different in that this defendant in court today was the person who swung the hammer violently and caused the lasting injuries that the Court knows about and has just heard about.

And so I think, Your Honor, when we put those two together, we have a sentence that, on the one hand, should be significant because of the raw violence and the harm and the injury, setting aside the context of it, and yet we can't set aside the context. And when we marry those two together, the Government thought long and hard; it considered the factors. And in a moment, I'll address the defendant himself and the arguments in mitigation. And we think seriously about the 40 years that we are recommending, and we think this crime,

those two aspects together, warrant that sentence.

They warrant that sentence also because specific deterrence appears to still be necessary here. The defendant has continued not to express remorse. The Court has already addressed that. And indeed, in the expert reports, we even saw some indication that the lesson is not done; the work is not finished. I don't know what that means, but I think specific deterrence remains a live issue.

And, of course, general deterrence is front of mind in this case. At this time, when political violence really strikes at the heart of everything and when we hear from the Speaker Emerita her own concerns about pulling people into this world, I think this is a moment where because of his conduct, the Court should be very mindful of the general deterrent value here.

I think, Your Honor, just briefly, if I can address the -- because I think this might be the final moment that I have to do it -- the arguments in mitigation.

What I would say about the expert reports is that they added some color to things that were probably apparent to the Court and certainly were apparent to the Government through the evidence in this case, including the trial evidence. We know that the defendant adopted and developed conspiracy theories. We know, though, also that he evaluated those conspiracy theories. He took some; he rejected some. These

were choices he was making, of course, within the context that is highlighted throughout those reports.

But what I think is important to focus on is that he had a choice, and he made the choices knowingly and deliberately, and then he continued to make those choices knowingly and deliberately throughout his statements to law enforcement and then, ultimately, on the stand.

And I will say, having confronted the defendant in cross-examination, this is a smart -- this is a smart man. He was able to follow directions. This is not a circumstance in which the blame can be placed elsewhere. And certainly, Your Honor, it cannot be placed on the victims, as he has constantly done by saying that they forced the choice. Of course they did not. They were unwitting, and the defendant is the one who made the choice.

And so I think, Your Honor, when we balance all of those circumstances and really apply those two lenses to the crime and think about all of the factors the Court has to weigh, the Government's recommendation is that the Court impose 40 years. We think it's necessary to keep this defendant away from the public for that significant period of time.

And I'm happy to answer any questions the Court has, but I will rest at this moment.

**THE COURT:** One question I have: Is the Government going to be seeking restitution?

**MS. VARTAIN:** No, Your Honor.

**THE COURT:** And the second is, I understand that Mr. DePape is under an ICE hold and so it's a virtual certainty that whenever he's released from custody, he'll be removed.

**MS. VARTAIN:** That is my understanding, Your Honor.

I can't speak to the virtual certainty, but he is under an ICE hold. Let me put it that way.

**THE COURT:** Okay. All right. Thank you.

All right. Ms. Chuang?

**MS. CHUANG:** Your Honor, I want to start off by acknowledging just how truly awful it is what Mr. DePape did to the Pelosis, and I don't think anyone disagrees with that. What he did to the Pelosis and, in particular, what he did to Mr. Pelosi is awful; it's inexcusable; it's unjustifiable. And we're not saying otherwise; he's not saying otherwise. That's why we're asking for a significant sentence.

The sentence we're asking for of 14 years, we're not coming in here and saying he only needs five years or the sentence should be even ten years. We're requesting a sentence of 14 years, which is a really substantial sentence, especially for someone who has no prior contacts with the criminal justice system. So we are not treating this lightly. We are taking it seriously, as we should. Mr. DePape is taking it seriously, and he understands he's going to serve a long time in prison for what he did.

I do think that the January 6th sentences, though, are instructive to the Court here. The Government, you know, is emphasizing heavily that this was an act of political violence; it was politically motivated. So was January 6th. But what happened there involved hundreds of people, the organized, premeditated organization by leaders of militant factions descending on the Capitol during a crucial moment in the transfer of power from one presidential administration to the next.

There were hundreds of victims there, hundreds of police officers who were personally assaulted by people who participated in the January 6th insurrection, and there were several people who ended up dying. So, of course, that is extremely serious as well.

But I think we need to view Mr. DePape's solo conduct in relation to that. And in looking at the sentences that some of -- the most serious sentences that those defendants received -- these are the leaders, the organizers who led hundreds of people in a violent mob. Many of them already had a history of violence, which Mr. DePape does not. And the five most serious sentences for people who were convicted of seditious conspiracy, literally conspiring to overthrow the Government, ranged from 15 to 22 years.

So I think that is instructive. That is part of the reason why our request is for 14 years, because we do not

believe it justified that Mr. DePape, in comparison to that conduct, should receive a higher sentence.

Some of the other comparisons that we laid out in our memo: The median length of murder sentences in the last five fiscal years nationwide in federal murder cases is 20 years. So what the Government is requesting is a sentence that is twice as long as sentences that people convicted of murder, of an unlawful actual killing another human being, are receiving in federal cases.

This is -- this is a serious case, there's no doubt, but this is not a murder case, and he should not be getting a sentence in excess of what people who actually killed someone else have received.

So I'm not going to rehash all of the details of everything that we laid out in our sentencing memo and the expert reports, since I know the Court has reviewed them, but I think they are crucial to understanding the idea of deterrence here.

So Mr. DePape was at a very low point in his life in the months leading up to this offense. His living situation was -- was bad. He didn't have bathroom access. He was very cut off, socially isolated, and he was spending essentially every waking hour listening to conspiracy theories that were promoted by people in places of power, by people who command a lot of respect.

And that, in combination with his unique personal history, including neurodiversity and mental health issues that, at the time, no one had diagnosed him with, he had never received any treatment for, and the lasting effects of a relationship that encompassed most of his adult life in which he was gaslit, he was abused, and he was very intentionally cut off from his family, who were one of his few sources of support, because of his neurodiversity.

So this is someone who for decades was just becoming more and more unstable; and then in the time right before the offense, he found out just incredibly disturbing revelations from his children that he knew were not true and that he knew his ex-partner had essentially convinced them that he had done awful things to them, things that he -- that strike him to his very core, I think would strike anyone to their very core. And that was the push. That was the push factor, as Dr. Moskalenko said.

These were conditions in which radical action, radicalization, all of that combined to create a perfect storm. Right? Where -- and that's what happened, and that's what caused him to do this. This is someone who has no history of violence. So to understand why someone with none of that history would suddenly do something so violent, I think needs to look at that broader context.

What is -- what is good about -- what is better now is

that Mr. DePape has now been able to reconnect with his family, who he'd been cut off from for so long, to the extent that is possible while he's in custody. They're there to support him -- he is now back in touch with them -- and are going to help him, whenever he gets released, to never fall into that situation again where he's isolated, alone, has no one to turn to, and where he's learning suddenly very shocking things that his children have accused him of that he never did. So I think that confluence of events is extremely unlikely to recur in the future.

Mr. DePape does feel great remorse about the violence that he committed, what he did to Mr. Pelosi. He did express that on the stand. He said, "I felt really bad," and he expressed a desire to apologize. It's not something he wants to do again. It's not -- this is not something he has ever done before.

And so I think with proper guardrails in place, along the lines of what the experts have recommended, to help ensure that things don't spiral to that sort of place again, I think that would go a long way in terms of deterrence.

With regard to general deterrence, again, 14 years is a substantial sentence. That is not a slap on the wrist. That is not a light sentence. He is going to be in custody for a very, very long time. That does send a message. It does send a message that conduct like this is not going to be tolerated and is going to end with over a decade in prison. It's a

substantial sentence.

But the 40-year sentence that the Government is recommending is simply far too long. It doesn't fit with other serious cases that we discussed. It doesn't fit with the understanding of the very unique situation in which Mr. DePape found himself at the time. And that's why we're asking for the 14 years here.

**THE COURT:** Can I ask you -- because I understand from your submission that the Bureau of Prisons will not give him credit for the time that he's been serving in state custody, and so I have to say that whatever sentence I give, then it'll be less the time he's been in custody.

And do we have agreement that, as of today, it's 18 months and 20 days?

**MS. CHUANG:** That's what I calculated. I don't know if the Government has double-checked that.

**MS. VARTAIN:** I did not double-check it, but it sounds --

**THE COURT:** You don't have any basis --

**MS. VARTAIN:** -- about right.

**THE COURT:** -- to disagree?

**MS. VARTAIN:** No. And I do agree with the factual contention. In fact, I have language that the Court could use in imposing the sentence, if it would be helpful.

**THE COURT:** I think I got it from the Sentencing

Guideline 5G1.3(b) --

**MS. VARTAIN:** Yes.

**THE COURT:** -- I believe.

**MS. VARTAIN:** Precisely.

**THE COURT:** So I have it written out. So if I say it wrong, someone jump in when I do that.

And also, to run concurrently with the sentence anticipated to be imposed in the state action; otherwise, the Bureau of Prisons would also run it consecutively.

**MS. VARTAIN:** That's correct, Your Honor.

**THE COURT:** Okay. Okay. Thank you.

So as I said earlier, my responsibility today is to impose a sentence that is no greater than necessary to achieve the goals set forth by Congress in 18 U.S.C. Section 3553(a).

And among the things I must consider are, Mr. DePape, your history and characteristics. And as your lawyer emphasized correctly, you have no criminal history and you were 40, 41 when this crime was committed, no criminal history whatsoever. And at least in the record before me, I recall there's no history of you even making threats. So this was, in that sense, aberrant behavior.

And also, as I think the expert reports show, given your circumstances, you were at a place in your life particularly vulnerable to holding the baseless conspiracy theories that you hold, to having those.

And your letters of support submitted by your family and friends show that how you acted, the way you acted upon those baseless conspiracy theories was unexpected. There wasn't anything in your past that led them.

And one thing that your counsel mentioned and that struck me, Mr. DePape, in reading those letters is that notwithstanding the terrible thing that you did and notwithstanding you having separated yourself -- you having separated yourself from your family for over 20 years, your family, particularly your mother and your twin sister, they still support you -- I hope you saw that and you read their letters -- and they still love you. So if there's any good at all that can come from this horrible thing, maybe that's that.

So don't forget that, because the love that they're showing you, notwithstanding what you have done not just in this incident but the previous 20-plus years, is remarkable. And so, remember that.

But in addition to your history and characteristics, I must also ensure that the sentence reflects the seriousness of the offense, that it promotes the rule of law, that it protects the public from future crimes, and it affords adequate deterrent to future -- to other criminal conduct.

And so in thinking -- and I've thought long and hard about this as to what an appropriate sentence would be -- there are three things that actually stand out to me.

One is, I am not satisfied that Mr. DePape does not currently pose a danger to the public. I've seen nothing that suggests that, if given the opportunity, he would not act again upon his baseless beliefs. While he has apologized and said he did not intend to hurt Mr. Pelosi, he's not said anything about the other targets on his list. Indeed, around three months after this incident -- which is also somewhat unprecedented, I think, and makes this particular crime stand out -- he called the TV station and he said (as read):

"I would also like to apologize. I want to apologize to everyone. I messed up. What I did was really bad. I'm so sorry I didn't get more of them. It's my own fault. No one is to blame. I should have come better prepared."

When we listened, when we heard that recording, it really sounds like he's taunting his victims. Actually, he's taunting America.

And at trial, when he testified on the stand, he actually confirmed that that was his intent. He said the apology that preceded it was overlong on purpose. He very intentionally that day taunted America. And we know it was America because he also testified that he was delivering a message to America.

So I have to take that into account when I come up with a sentence today. I believe he's presently dangerous.

The second thing that stood out to me is that that very

violent act was completely gratuitous, completely gratuitous. When he learned that Speaker Pelosi was not at home, he didn't leave. And even he testified that Mr. Pelosi told him that when she does come home that weekend and when she always comes home, she has the Secret Service with her. So he knew at that point, as he testified, his whole plan with respect to her was a wash, but he didn't leave.

He also testified that as soon as, actually, he broke the glass window with his hammer, he knew as well that the gig was up because, as he said, there are Ring camera -- those Ring devices are everywhere.

And then he knew when the door was opened and the police were standing there with a body-worn camera, we know from what he said to the paramedics right after, he knew he was being filmed. He knew there was no point.

And yet, when the police said "Drop the hammer," instead, he turned and he hit, he hit Mr. Pelosi over the head with, in his own words, again, as he testified at trial, full force; with such full force he, in fact, also testified at trial that he actually thought he had killed him; and it wasn't until he was charged with attempted murder by the State, rather than murder, that he realized that Mr. Pelosi hadn't died. So that's also, I think, something that sets this crime apart.

And the third thing, I think, is the harm that Mr. DePape's crime has caused all Americans actually and, in

fact, future Americans.

Since President Lincoln was assassinated, people running for office, choosing to go into public service know that they are taking their own life at risk. They're putting their own life at risk by choosing to do so. This was confirmed with the assassination of John F. Kennedy, with the attempted assassination of Ronald Reagan and even Gerald Ford. But these public servants decide: I'm willing to take that risk myself and put myself at risk to serve the public.

But what Mr. DePape did and I think what makes the analogy to January 6th -- although, as you said, in part -- but why it's inadequate to reflect the seriousness of his offense is, he broke into the home of that public official. He broke into that private space, the home, and violently attacked the public official's spouse. That act is unprecedented. That's unprecedented. Right? We cannot come up with anything where someone actually went into the home and attacked the government official's family member.

And what that means, and why this now is so harmful to everyone in the country in the future, is that when someone is considering now if they want to go into public service, they have to think not only "Am I willing to take that risk myself?" but "Am I willing to risk my spouse, my children, my grandchildren?"

And I think we all know the answer is that some people who

may have been great leaders, who may have really changed people's lives and made a difference, are going to say, "It's not worth it. It's not worth it. I can't make that decision for my family; therefore, I'm not going to enter into public service."

And because of that, we will never know everything that we have lost because of this crime because he actually -- he went to the home. It's completely, completely unprecedented, breaking into the home of -- the public official's home.

So in taking into account all of the relevant factors then, I intend to sentence Mr. DePape to the statutory maximum on each count, 20 years on Count One and 30 years on Count Two, to run concurrently with each other and concurrently with any sentence imposed in the San Francisco Superior Court action, with credit for the time he has already served.

So pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that David Wayne DePape is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 360 months, less the amount of time he has served and which the Bureau of Prisons will not give him credit; namely, 18 months and 20 days. The sentence consists of 240 months on Count One and 360 months on Count Two, to run concurrent with each other.

The sentence of 360 months, minus the 18 months and 20 days that he has already served, is to run concurrently with

the sentence to be imposed by the San Francisco Superior Court Action Number 22-012966, pursuant to Sentencing Guideline 5G1.3(b).

The Court imposes a five-year term of supervised release. This term consists of three years on Count One and five years on Count Two, with such terms to run concurrently. However, upon release from imprisonment, Mr. DePape will likely be deported and not be in the United States to be supervised. At all times, the defendant must comply with the rules and regulations of the United States Immigration and Customs Enforcement and, if deported, must not reenter the United States without the express consent of the Secretary of the Department of Homeland Security.

If the defendant is deported and within five years of release from imprisonment returns to this country, legally or illegally, the defendant must report to the nearest Probation Office within 72 hours of reentry. If the defendant, for some reason, is not deported and remains in this country, the defendant must report to the nearest Probation Office within 72 hours of release from imprisonment.

In either event, while on supervised release, Mr. DePape must not commit another federal, state, or local crime; must not unlawfully possess a controlled substance; must refrain from any unlawful use of a controlled substance, submit to a drug test within 15 days of release and two periodic drug tests

thereafter; no restitution is being sought; and must cooperate in the collection of DNA and comply with the following conditions.

The standard conditions which have been adopted by this Court and listed in the attachment to the Presentence Report recommendation, identified as the standard conditions of supervision, are hereby imposed and incorporated into this sentence.

And the following special conditions shall apply:

You must pay any special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

You must undergo an assessment for mental health treatment services. If services are deemed appropriate, then you must pay for part or all of the cost of treatment as directed by the probation officer. You must adhere to a co-payment schedule as determined by the probation officer. Payments must never exceed the total cost of mental health counseling. The actual co-payment schedule must be determined by the probation officer.

You must submit your person, residence, office, vehicle, or any property under your control, including any computer, cell phones, and other electronic devices, to a search. Such a search must be conducted by a United States probation officer at a reasonable time, in a reasonable manner, based upon

reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any residents that the premises may be subject to searches.

It is further ordered that Mr. DePape shall pay the United States a special assessment of $200. Payment shall be made to the Clerk of the U.S. District Court, 450 Golden Gate Avenue, Box 36060, San Francisco, California 94102, or via the Pay.gov online payment system. During imprisonment, payment of criminal monetary penalties are at the rate of not less than $25 per quarter, and payment shall be through the Bureau of Prisons Inmate Financial Responsibility program.

The Court finds Mr. DePape does not have the ability to pay the fine and orders it waived.

I find this sentence, Mr. DePape, adequately and best serves the factors set forth in 18 U.S.C. 3553(a). But as I said, the one silver lining is you have reconnected with your family, and my hope is that you will continue, to the best that you can, given the circumstances, continue to do so.

I do want to remind you that you do have the right to appeal your conviction and your sentence; and given you do not have the ability to afford counsel, counsel will be, at your request, appointed to represent you.

Is there anything further?

**MS. VARTAIN:** No. Thank you, Your Honor.

**THE COURT:** All right. Thank you very much.

**THE CLERK:** Court's in recess.

(Proceedings adjourned at 10:53 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, May 20, 2024

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter